UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANET ASMAR and KEN LUKATCH,

      Plaintiffs,

v.

BENCHMARK LITERACY GROUP, INC.,
EAGLE LITERACY GROUP, INC., ROBERT
W. HANSON, JR., AMERICAN FINANCIAL
ACCESS, INC., AMERICAN FINANCIAL
AVENUES, INC., AND ERIC F. FAGAN,

      Defendants.

                                        Case No. 04-70711

and
                                        Honorable Nancy G. Edmunds

BENCHMARK LITERACY GROUP, INC.,
EAGLE LITERACY GROUP, INC., AND
ROBERT W. HANSON, JR.

      Defendants and Third-Party Plaintiffs,

v.

BUNNING, BORST, ENFIELD & KLEIN, LLP,
TODD BORST, AND DOUGLAS E. POWELL

      Third-Party Defendants
_____/

**ORDER
(1) DENYING DEFENDANT AMERICAN FINANCIAL ACCESS, INC.'S MOTION FOR
SUMMARY JUDGMENT [62]
(2) GRANTING THIRD-PARTY DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT OF THIRD-PARTY COMPLAINT [67]
(3) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON ISSUE OF LIABILITY [68]
(4) GRANTING IN PART AND DENYING IN PART DEFENDANT BENCHMARK
LITERACY GROUP, INC., AND DEFENDANT ROBERT W. HANSON, JR.'S, MOTION
TO DISMISS AND FOR SUMMARY JUDGMENT [69]
(5) GRANTING DEFENDANT ERIC F. FAGAN'S MOTION FOR DISMISSAL OR IN
THE ALTERNATIVE FOR SUMMARY JUDGMENT [78]**

Plaintiffs allege on behalf of themselves and a proposed class that Defendants have violated the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679 *et seq.*, which prohibits Credit Repair Organizations from, among other things,  pre-charging customers for services not yet performed.   Plaintiffs contend that they were pre-charged by Defendants.  Discovery is complete, and the parties have filed several competing motions for summary judgment.

I.    **Facts**

A.  **AFA Defendants**

This lawsuit was filed originally against, among others, a company called American Financial Access, Inc. ("AFA").  AFA was a for-profit, non-tax-exempt corporation in the business of credit repair.  The company's CEO and Principal was Defendant Eric F. Fagan, and its Registered Agent was Ute Goldkuhle.  The company operated out of California. (Doc. 68, Ex. 8,9.)[1]  AFA maintained a website, www.amerfi.com, with which it marketed to consumers nationwide a "credit restoration program" called "Credi-Clean," which consisted of "programmatic, strategically-timed consistent written communication to bureaus disputing all negative items the client indicates should be removed" from his or her credit report.  (*Id.* at Ex. 10.)  It also utilized a group of sales representatives located in various cities around the country, including the Detroit area.  (Doc. 91, Ex. A8.)

AFA's website included buttons allowing customers to "Enroll Now!" and "Enroll Online."  The website included a page titled "addCart," which allowed customers to request the quantity of the program they wished to purchase.  The cost of individual service was

---

[1]All references to the pleadings, motions, and memoranda of law, and exhibits are referred to under their corresponding CM/ECF docketing numbers.

$499; the cost of service "With Spouse" was $848.  (*Id.*)  It does not appear, however, that customers could pay online.   Another button allowed existing clients to check their progress.

While customers might infer that AFA itself provided the credit restoration service, there is evidence that it was not acting alone:

> *Our Credit Affiliate's* approach to cleaning up your client's credit is based on a system of computer-generated challenges.  They will go after every item on your client's credit that is erroneous, inaccurate, outdated, or that cannot be verified . . . .  *Our Affiliate* gives its best efforts on your client's behalf for up to twelve months . . . .  If your client's credit does not improve, your client will receive a 100% refund.

(*Id.* (emphasis added).)

In fact, AFA did not itself provide credit repair service.  Rather, its customers received services of another company, Choosing Reasons to Change, Inc. ("CRCI").[2]  CRCI is run by Ute Goldkuhle, the 100% owner of AFA.  (Doc. 62, Ex. 1, 4, 5, 6.)

Plaintiff Ken Lukatch signed up for the credit restoration program on February 21, 2004.  After meeting in Michigan with AFA representative G. Timothy Liang, Lukatch signed an a "Client Application" for "American Financial Access, Inc."  Although he had not yet received any credit repair service, Lukatch indorsed a $399 money order to AFA.  (Doc. 68, Ex. 12.)[3]  On the same day, Lukatch signed a "Special Limited Power of Attorney," which "appoint[ed] Choosing Reasons to Change, Inc. . . . as [his] attorney-in-fact to act in [his]

---

[2]It actually appears that there were two service providers.  Choosing Reasons to Change, Inc., and Changes Recovery Center, Inc.  Both are run by Ute Goldkuhl.  (Doc. 62, Ex. 1, 4, 5, 6.)

[3]It is unclear from the exhibits why Lukatch was only charged $399, rather than the $499 stated on AFA's website.  It is also unclear how Lukatch came into contact with G. Timothy Liang.

place for the sole and exclusive purpose of disputing erroneous, inaccurate, outdated or unverifiable information on [his] credit reports . . . ."  (Doc. 62, Ex. 8.)  Four days later, Lukatch filed this lawsuit.

On the same day that AFA was served with notice of the suit, Defendant Eric F. Fagan, on behalf of AFA, sent a $399 money order to Lukatch.  (*Id.* at Ex. 25.)  The following day, American Financial Avenues was born.  American Financial Avenues is operated by the same CEO/Principal, Eric F. Fagan, and the same Registered Agent, Ute Goldkuhle, as American Financial Access had been.  (*Id.* at Ex. 8, 15.)  It operates out of the same California address and uses the same telephone and facsimile numbers.  (*Id.* at Ex. 8, 12, 13, 17.)  Conveniently, the two companies share initials, so Avenues purchased from Access the use of its logo, which depicts the letters "AFA" behind a shooting star.  In the same agreement, Avenues purchased for $8,000 Access's compensation plan and its website, which remains at the same URL and which markets the same credit repair service. The agreement was executed by Ute Goldkuhle, as President of Access, and Eric F. Fagan, as CEO of Avenues.  (*Id.* at Ex. 18.)  Presumably, negotiations between the two companies went relatively smoothly, as Ute Goldkuhle is 100% shareholder of each.  (*Id.* at Ex. 9, 16.)  American Financial Access ceased doing business on June 1, 2004.  (*Id.* at Ex. 9.)  The "new" AFA is nearly indistinguishable from its predecessor.[4]

### B.  Benchmark/Eagle Defendants

Benchmark Literacy Group ("Benchmark"), like AFA, is a credit repair company operating out of California.  Its former President is Defendant Robert W. Hanson.

---

[4]Where distinction is unnecessary, therefore, both companies are referred to under their shared initials, AFA.

Benchmark maintains an internet website and a network of sales representatives.  (Doc. 68, Ex. 20, 21.)  Benchmark was formerly known as American Financial Solutions, Inc. ("AFS"), but changed its name during the course of this litigation, on May 18, 2004.  (*Id.* at Ex. 19.)  AFS is no longer a party to this lawsuit.[5]

On its website, Benchmark markets a "Credit Correction Program" similar to that offered by AFA:

> The BLG Credit Correction Program can help you get inaccurate, erroneous, and obsolete information off your credit report so you can get the accurate credit that you deserve.  BLG provides a one-of-a-kind service.  They work with you . . . .  They provide personal guidance and direction through the entire process, and they provide regular updates and will contact you to review your account status and determine the next steps . . . .  [T]here is no secret to what BLG does to help you . . . .  They just help you exercise your legal rights, but they do so with a one-of-a-kind approach . . . .  If BLG cannot do it, they will tell you . . . .  BLG is your solution to a new and exciting future.

(Doc. 93, Ex. 33.)

At the time that this lawsuit was initiated, the website stated, "AFS [now Benchmark] works with you to identify and remove any inaccurate, erroneous, or obsolete information from your credit reports," and that "AFS provides a one-of-a-kind service . . . .  We work with you throughout the entire credit correction process."  (*Id.* at Ex. 21.)  The current version is virtually indistinguishable, except that it states, "ELG works with you . . . .  ELG provides . . . ." (Doc. 68, Ex. 21.)  The change accounts for a January 10, 2005, agreement between Benchmark and Defendant Eagle Financial Services ("Eagle"), a California non-profit[6] organization founded by Defendant Robert W. Hanson less than three weeks after

---

[5]Where distinction is unnecessary, both companies are referred to under their current name, Benchmark.

[6]Eagle's application for non-profit status is currently pending.

5

Plaintiffs filed their complaint in the present case.  (Doc. 67, Ex. 2.)[7]  Under Benchmark's agreement with Eagle, Eagle performs the actual credit repair services, and pays a commission to Benchmark equal to eighty percent of Benchmark's gross sales revenue. (Doc. 88, Ex. 4.)

Benchmark sells a basic plan for $529, and a "Two for One" plan for $810.  (Doc. 68, Ex. 21.)  Plaintiff Janet Asmar contacted Benchmark via telephone and through the internet website.  She claims to have been quoted a fee of $399 for credit repair services.  (*Id.* at 7.)  She filled out the online enrolment form, which required her to submit several pieces of personal information, including her credit card number.  The form was a part of Benchmark's own website.  (*Id.* at Ex. 21.)  Ms. Asmar's credit card was charged $529 on February 19, 2004.  Her monthly statement verifies that payment went to myPaySystems.com, a Canadian-based internet billing account service provider.  (*Id.* at Ex. 24.)  MyPaySystems.com fully refunded Asmar's money on March 10, shortly after this lawsuit was filed.  (*Id.*)[8]

_____

[7]Eagle was incorporated under the name American *Finance* Solutions, barely distinguishable from Hanson's then-existing for-profit business, American *Financial* Solutions. In May of 2004, American Finance Solutions changed its name to Eagle Literacy Group, and American Financial Solutions changed its name to Benchmark Literacy Group. (Doc. 67, Ex. 2.)

[8]Where the money went in the meantime is unclear.  At oral argument, counsel for Benchmark stated that myPaySystems typically held on to payments for one week, or up to two weeks.  Here, twenty days elapsed between the dates of payment and refund. Sandy Peters, Secretary of Eagle Literacy Group, states that "Mypaysystems.com never transmitted Janet Asmar's payment to Eagle Literacy Group, Inc., (formerly American Finance Solutions), but instead refunded same to Asmar . . . ." (Doc. 88, Ex. 2.)  Ms. Peters does not say whether myPaySystems.com transmitted the money to Benchmark (formerly American Financial Solutions).  Benchmark's current President, Ray Smith, states that "BLG has no current or past agreement or affiliation with mypaysystems.com of Canada nor was it a participating vendor therewith."  (*Id.* at Ex. 5.)  Mr. Smith does not

6

Benchmark has since changed its enrolment procedure.  Now, online customers are directed to an "ELG Client Agreement," which they may download in pdf format.  The new "Client Agreement," "Limited Power of Attorney," and "Welcome Letter" make clear that customers are working with Eagle, and nowhere depict Benchmark.  Customers can make payments in many ways, though it does not appear that they may pay online; credit card orders must be mailed.  Customers are directed to "Make Checks Payable to: Eagle Literacy Group."  (Doc. 70, Ex. 7.)

## C.  BBEK Third-Party Defendants

In the fall of 2003, Benchmark (then AFS[9]) and Robert W. Hanson, Jr. (collectively for purposes of third-party complaint, "Benchmark"), retained the law firm of Bunning, Borst, Enfield & Klein, LLP, and attorneys Todd Borst and Douglas E. Powell (collectively, "BBEK").  Benchmark sought BBEK's representation for purposes of incorporation, trademark services, and accounting, training, and preparation for Form 1023 filing with the IRS for tax-exempt status.  According to Benchmark, this included the actual filing of Form 1023.  The purpose of this representation was to assist Benchmark in seeking exemption from CROA.  (Doc. 80, Ex. 2.)

---

mention AFS—the predecessor to Benchmark, which existed at the time this lawsuit was filed.  Benchmark's former President, Defendant Robert W. Hanson, states, "I have no current or past agreement or affiliation with mypaysytstems.com [sic] of Canada nor was I a participating vendor with that company."  (*Id.* at Ex. 1.)  Mr. Hanson only speaks in the first person, however, and given that he is personally a party to this lawsuit, it is unclear whether he is also referring to the company he ran.

[9]As discussed above, Benchmark was formerly known as American Financial Solutions ("AFS").  At the time AFS retained BBEK, it appears that AFS itself sought tax-exempt status.  Having been sued under CROA, however, AFS changed tactics, and instead sought tax-exempt status for American Finance Solutions (now Eagle Literacy Group), a separate non-profit entity, whose services Benchmark markets.

BBEK incorporated Benchmark, and allegedly advised the company that it was appropriate to begin credit repair services while the Form 1023 application was pending. BBEK did not, however, file a Form 1023. (*Id.*)  In May of 2004, after the present lawsuit was filed, Benchmark and BBEK met.   At that meeting, a BBEK attorney allegedly discovered his firm's failure to file a Form 1023, and stated, "We dropped the ball . . . .  Is this a big deal?"  (*Id.* at Ex. 3.)

## II.    Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

8

The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.  Analysis

### A.  First-Party Complaint

#### 1.  Personal Jurisdiction

Defendants Benchmark Literacy Group, Robert W. Hanson, and Eric F. Fagan argue that this Court lacks personal jurisdiction over them.[10]

Personal jurisdiction is appropriate where it complies with both the state's long-arm statute and constitutional due process requirements.  *Audi A.G. and Volkswagen of America, Inc., v. D'Amato*, 341 F.Supp.2d 734, 741 (E.D. Mich. 2004).  "The Michigan Supreme Court has construed Michigan's Long-Arm Statute to bestow the broadest possible grant of personal jurisdiction consistent with due process."  *Id.*  Thus, the two questions are merged into one.  *Id.*  The Sixth Circuit has set forth three requirements of personal jurisdiction:

> First, the defendant must purposely avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 150 (6th Cir. 1997) (quoting *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

---

[10]Defendants American Financial Access and American Financial Avenues have not raised this argument.

"[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (U.S. 1985).  Thus, physical presence within the forum jurisdiction is not necessary.  *Id.*  Furthermore, while mere advertisement over the internet is not sufficient to support personal jurisdiction, internet sales often will. *Sports Auth. Mich., Inc., v. Justballs, Inc.*, 97 F.Supp.2d 806, 812 (E.D. Mich. 2000).

Websites are generally categorized as one of three types.  First are highly interactive sites allowing for the exchange of a great deal of information between the viewer and the website.  Jurisdiction is typically reasonable here.  Second are merely passive sites simply providing information for the viewer.  Jurisdiction is typically unreasonable based only on these sites.  Third are the sites somewhere in-between the preceding two groups, which allow only a limited amount of information exchange.  With these sites, courts look at the amount of interactivity to determine whether the defendant has purposefully availed itself to the forum jurisdiction, and the reasonableness of exercising personal jurisdiction.  *Audi A.G.*, 341 F.Supp.2d at 742-43.  Within this third group, when websites actually sell their products online, rather than simply providing contact information, courts typically find purposeful availment sufficient to support personal jurisdiction.  *See*, *e.g.*, *id.* at 744-45; *Sports Authority*, 97 F.Supp.2d at 814.

### c.  Defendant Fagan

10

In addition to providing information to viewers, AFA's website allows customers to enroll online.[11]   On its "Login" screen, it permits existing customers, after creating a user name and password, to check the status of their accounts.  Although customers can not pay for AFA's service online, there is a significant exchange of information between the viewer and host.  Furthermore, AFA's has a nationwide staff of sales representatives which meets with customers personally to enroll them in its programs and work with them.  Plaintiff Lukatch was visited by one such sales representative in Michigan.  Under these facts, there is very little question that AFA purposefully availed itself.   Thus, personal jurisdiction over Defendant Eric F. Fagan is appropriate.

### d.  Defendants Benchmark and Hanson

Defendant Benchmark did not raise its jurisdiction argument either in its Answer to Plaintiffs' First Amended Complaint and its Affirmative Defenses, its Answer to Plaintiffs' Second Amended Complaint, or in a timely motion to dismiss.  Defendant Hanson, while raising personal jurisdiction as an affirmative defense, has participated in this litigation on the merits alongside Benchmark.  Benchmark and Hanson have jointly filed a Third-Party Complaint, litigated several non-dispositive motions, actively participated in status conferences, and tendered discovery on maters other than jurisdiction.[12]  By their conduct, Defendants Benchmark and Hanson have waived any personal jurisdiction objections that

---

[11]As discussed above, AFA has changed the enrollment process since this lawsuit was filed.  Now, it appears that customers may no longer be able to enroll online.

[12]Benchmark and Hanson state that "all parties sat down with the Court early on in this proceeding and agreed upon a course of action which would defer motions and discovery . . . ."  (Doc. 89, 2.)   The Court never implied that Benchmark and Hanson need not raise their personal jurisdiction arguments.  Nor did the Court understand that to be the agreed "course of action."

11

they may have had.  *See*, *e.g.*, *Rauch v. Day and Night Mfg. Corp.*, 576 F.2d 697, 701 (6th Cir. 1978) ("Case law is unanimous in holding . . . that where a defendant files a pre-answer motion to dismiss or an answer, without raising the defense of a lack of in personam jurisdiction, he waives any objection to that defect"); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1138 n.5 (6th Cir. 1991) (participation in litigation constituted waiver).

Even assuming, however, that Benchmark and Hanson did not waive personal jurisdiction arguments, the Court has personal jurisdiction over them.  Like AFA, Benchmark maintains a website that allows users to log in and view their status online. They may enroll online and, unlike AFA's website, Benchmark allows customers to pay for services online as well.  This is exactly what Plaintiff Asmar did.  Although there is no evidence of Benchmark sales representatives located in the forum jurisdiction, the level of interactivity of Benchmark's website shows that it purposely availed itself to Michigan. Thus, personal jurisdiction over Defendants Benchmark and Hanson is appropriate.

### 2. CROA Violation

#### a. The Credit Repair Organizations Act

In 1996, in response to allegedly widespread fraud and unfair business practices in the credit repair industry, Congress passed the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.*  CROA sought to address, among other things, some credit repair organizations' practices of charging customers up-front for services, but then failing to deliver.  Thus, CROA prohibits, among other things, pre-charging for credit repair services: "No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization ha agreed to perform for any consumer before such service is fully performed."  *Id.* § 1679b(b).

12

CROA applies to Credit Repair Organizations ("CROs"), which are defined under the statute as follows:

> (A) . . . any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—
>
> (i) improving any consumer's credit record, credit history, or credit rating; or
>
> (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . .

*Id.* § 1679a.  CROA does not apply, however, to "any nonprofit organization which is exempt from taxation under section 501(c)(3) of the Internal Revenue Code . . . ."  *Id.*

### b.   Corporate Defendants

#### i.   AFA

As AFA would have the Court believe, the threshold issue in this case is "whether [AFA's] status as an agent of credit repair companies that [are] exempt under the Credit Repair Organizations Act . . . in turn exempts [AFA] from that same Act."  (Doc. 77, p. 2.)

AFA goes to great lengths to demonstrate that it acts merely as an agent of the actual provider of credit repair services—its tax-exempt affiliate, CRCI.  AFA points to an agreement which "appoints and authorizes" AFA to "advertise, promote and market" the services.  (Doc. 62, p. 7.)  "In short, AFA's agency obligation was to find clients for CRCI to service, charge them money, subcontract a commission and forward the rest of the funds to CRCI, and adhere to price and proprietary concerns of CRCI . . . .  Accordingly, it is beyond reasonable dispute that AFA was the agent of CRCI."  (*Id.* at 8.)  AFA might stand on firmer ground if CRCI had been an independent non-profit organization in the credit

13

repair industry, with whom AFA had contracted for marketing purposes. But CRCI and AFA are not independent of each other; they are owned and run by the exact same people. Indeed, it appears that Defendant Eric F. Fagan and Ute Goldkuhl established the non-profit CRCI in order to get around CROA's regulations while generating profits with AFA.[13]

Regardless of who is acting as agent for whom, AFA's argument places far too much emphasis on the common law of agency, and the Restatements in particular. Under the Second Restatement of Agency, "An agent is privileged to do what otherwise would constitute a tort if his principal is privileged to have an agent do it and has authorized the agent to do it." (*Id.* at 9 (quoting Restatement (Second) of Agency § 345 (1958)).) AFA appears to argue that this is in some way controlling authority for this Court: "There is nothing in the reading of the CROA that overrules the Restatement Second of Agency." (Doc. 74, p. 2.) The Court must look to Congress, however, rather than the American Law Institute, in interpreting CROA.

CROA applies to those who "sell, provide, or perform (or represent that such person can or will sell, provide, or perform)" credit repair services. 15 U.S.C. § § 1679a. Initially, there is little question that AFA is a seller of credit repair services. Although AFA describes itself as a "marketer" of CRCI's services, it is indisputable that AFA also *sold* credit repair services to Plaintiff Ken Lukatch. AFA charged Lukatch and Lukatch paid AFA. It is of no consequence whether AFA typically gives a portion of its proceeds to CRCI, or sometimes refunds fees to customers such as Lukatch. AFA sold the services.

---

[13]Perhaps a more accurate description of this relationship is that CRCI is the agent of AFA, providing the services that AFA is in the business of selling.

14

This reading comports with a recent analogous case in the District of Maryland, where the court ruled that a for-profit telemarketing organization was not exempt from Federal Trade Commission regulation because it was working on behalf of a non-profit organization. As that court there found, "Courts have held that an entity's exception from FTC jurisdiction is based on that entity's *status*, not its activity." *National Federation of the Blind v. Federal Trade Commission*, 303 F.Supp.2d 707, 715-15 (D. Md. 2002) (emphasis in original). This reasoning applies to the present case as well.

In addition to its actual sales, AFA also *represents* that it sells, provides, and performs credit repair services. Although its power of attorney form refers to CRCI, and its website refers to its "Affiliate," AFA states elsewhere that it provides and performs credit repair services itself. For example, AFA's website refers to "Our Credi-Clean service," and the application for credit repair service lists only the name of American Financial Access, Inc. Furthermore, in the "Letter of Understanding of AFA's Credit Restoration Process"—which instructs customers "not [to] rely on information from any source that would appear to conflict" with its terms—AFA repeatedly describes the credit repair process in terms such as "We," "Our," and "Us." For example,

> *We* want to do the best possible job for you . . . . Please send *us* the original of anything you get from the credit bureaus . . . . *We* understand that you wish maximum improvement in your credit profile, and *we* certainly want to give you that . . . . *We* do promise that you will get *our* best efforts . . . . Within six months, *we* will have accomplished pretty much what *we* will be able to do for you.

(Doc. 74, Ex. 3 (emphasis added).) Nowhere does AFA mention any affiliate. Rather, it instructs customers to send the agreement "to AFA . . . . We will be unable to begin the dispute process on your behalf until we receive this letter of understanding." (*Id.*) In *Parker*

*v. 1-800 Bar None*, 2002 WL 215530 (N.D. Ill. Feb. 12, 2002), the court explained that "[t]he plain language of section 1679a(3)(A) . . . does not require an entity to actually 'provide' the services listed to qualify as a credit repair organization. Instead, the entity need only 'represent' that it can or will provide such services." *Id.* at *3. The same is true here.

Finally, in an attempt to show that this case is moot, AFA points out that it no longer accepts money or applications for credit repair services, as it used to. AFA itself points to language that forecloses this argument. In *Friends of the Earth v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), the Supreme Court indicated that a case may be moot only if the alleged wrong "could not reasonably be expected to occur." *Id.* at 170. Here, given the myriad ways in which AFA has already manipulated its business practices without hesitation, that is just not the case.

In summary, AFA's sales and representations bring it within the reach of CROA. And based on the evidence generated through discovery, it is obvious that AFA violated CROA's prohibition on selling credit repair services before performing those services.

### ii.   Benchmark Literacy Group

Like AFA, Benchmark also contends that Plaintiffs lack standing to bring this case. Under *Friends of the Earth v. Laidlaw*, Plaintiffs must show that they have suffered a concrete injury, that the injury is fairly traceable to Defendants, and that a favorable result will redress the injury. 528 U.S. at 180-81.

Benchmark pre-charges its customers, including Janet Asmar, for credit repair services. This is prohibited under CROA, and constitutes an injury in fact. Furthermore, it is irrelevant whether Benchmark employs a go-between, myPaySystems.com, to collect payment. The injury is "fairly traceable" to Benchmark. Finally, it is irrelevant whether

16

these funds were later refunded to Asmar.  Standing is determined at the time the litigation is commenced.  *Senter v. General Motors Corp.*, 532 F.2d 511, 520 (6th Cir. 1976) ("reforms after-the-fact do not moot questions already presented for review").  Here, Asmar's money was refunded *after* Benchmark received notice of this lawsuit.

Benchmark next argues that it is not subject to CROA because it does not sell credit repair services.  This is similar to AFA's agency theory, discussed above.  Benchmark contends that it merely "markets the services and products of credit repair organizations such as Eagle Literacy Group, Inc." (Doc. 88, p. 9.)  "[T]his marketing relationship does not make [Benchmark] a 'credit repair organization' within the meaning of CROA any more than a radio or television station becomes a credit repair organization when it markets or promotes the messages and advertisements of credit repair organizations." (*Id.* at 10.)

Benchmark's analogy is unpersuasive.  Unlike a radio station, Benchmark actually *sold* credit repair services, just like AFA.  Benchmark contends that "[t]here was no payment made to Benchmark.  There was only a payment tendered to myPaySystems.com and refunded to Asmar." (Doc. 88, p. 11.)  Whether the money remained with the go-between, myPaySystems.com, is irrelevant.  Asmar completed an order form and submitted her credit card information on Benchmark's own website.  There was a sale.

Even assuming that no actual sale took place because Asmar's money did not arrive in Benchmark's hands, Benchmark certainly *represented* that it sells, provides or performs credit repair services.  For example, although Benchmark has recently updated its website to include the term "ELG," it continues using language such as the following:

> The *BLG* Credit Correction Program can help you . . . .  *BLG* provides a one-of-a-kind service.  *They* work with you . . . .  *They* provide personal guidance and direction . . . and *they* provide regular updates . . . .  [T]here is no secret

> to what *BLG* does to help you . . . .   *They* just help you exercise your legal rights, but *they* do so with a one-of-a-kind approach . . . .   If *BLG* cannot do it, they will tell you . . . .   *BLG* is your solution to a new and exciting future.

(Doc. 93, Ex. 33.)  As the Court in *Parker* pointed out, 2002 WL 215530 at *3, and as the plain language of CROA makes clear, these representations suffice to bring Benchmark within the parameters of the legislation.

Based on the evidence now before the Court, it is relatively clear that Benchmark has violated CROA's ban on selling credit repair services prior to performance.  Although an argument might be made that Benchmark never "sold" the services, CROA clearly states that credit repair organizations may neither "charge or receive" payment in advance of performing services.  Benchmark charged Asmar before providing services, in clear violation of CROA.

### c.    Individual Defendants

Plaintiffs rely on a number of cases to argue that individual defendants may be liable for the acts of corporations under CROA, where the individuals participate in corporate wrongdoing by, for example, directing, controlling, formulating policies, or having authority to formulate policies.  None of the cases cited by Plaintiffs, however, directly address the same violations of CROA that are at issue here.  Rather, each falls under the broader Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.*, and concerns fraudulent activity by corporate officers.  Plaintiffs' principle authority, *In re National Credit Management Group, L.L.C.*, 21 F.Supp.2d 424 (D.N.J. 1998), makes perfectly clear that the individual defendants were liable not under CROA, but "pursuant to Section 5 of the FTCA," which addresses fraud.  *Id.* at 461.  Plaintiffs have provided no authority for extending such liability to the corporate officers in the present case.

18

It is true, as Plaintiffs point out, that Michigan rejects the "fiduciary shield" doctrine. *W.H. Froh, Inc., v. Domanski*, 252 Mich. App. 220, 237 (Mich. Ct. App. 2002). But the fact that Defendants Hanson and Fagan are not shielded does not alone provide a basis for their liability. Rather, Plaintiffs must show that these individuals are, in their personal capacities, "Credit Repair Organizations" as defined in CROA and discussed above.

Plaintiffs have failed to do so. Neither Hanson nor Fagan has engaged in any activities that would qualify them *personally* as "Credit Repair Organizations" under CROA. While they made decisions, formulated policies, and generally directed their respective companies, this alone does not bring them within CROA. Neither of the individual defendants is a Credit Repair Organizations as defined by CROA.

### 3. Successor Liability

Defendant American Financial Avenues argues that it cannot be held liable for Plaintiffs' claims against American Financial Access. Plaintiffs contend, however, that American Financial Avenues may be liable under a theory of successor liability. Plaintiffs further contend that American Financial Avenues is operating in almost exactly the same way as American Financial Access operated, and therefore may be liable in its own right.

The federal courts have not been presented with the question whether successor liability applies to CROA. In general, however, successor liability applies only in limited circumstances. One common example is where "the purchaser corporation is merely a continuation of the seller corporation." *Conn v. Fales Div. of Mathewson Corp.*, 835 F.2d 145, 146 (6th Cir. 1987) (interpreting Kentucky law). This "mere continuation" doctrine is the rule in most jurisdictions. *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1457 (W.D. Mich. 1988). Furthermore, "[i]n cases where the underlying action sounds in federal

19

law, courts have also fashioned relief for claimants under the law of successor liability." *Id.* (citing *Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1289 (8th Cir. 1983), *cert. denied*, 464 U.S. 1044 (1984) (patent law); *Trujillo v. Longhorn Manufacturing Co.*, 694 F.2d 221, 224-225 (10th Cir. 1982) (Title VII case); *Atlas Tool Co. v. Comm. of Internal Revenue*, 614 F.2d 860, 870 (3rd Cir.), *cert. denied*, 449 U.S. 836 (1980) (IRS case); *Acheson v. Falstaff Brewing Corp.*, 523 F.2d 1327 (9th Cir. 1975) (labor dispute); *Goldstein v. Gardner*, 444 F. Supp. 581, 583 (N.D. Ill. 1978) (securities law); *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834 (S.D.N.Y. 1977) (securities law)). This includes the mere continuation doctrine. *Id.* Thus, it is appropriate for this Court to apply the mere continuation doctrine of successor liability to American Financial Avenues.

The key element in the mere continuation test is whether there is "a common identity of officers, directors, and stock between the selling and purchasing corporations." *Tucker v. Paxson Machine Co.*, 645 F.2d 620, 625-26 (8th Cir. 1981). Here, the test is unquestionably met. As discussed above, American Financial Avenues was founded only one day after Defendant American Financial Access received notice of the present lawsuit. Defendant Eric F. Fagan and Ute Goldkuhle are the officers of each company, Goldkuhle owns all of the stock in each company, and the companies are nearly identical in every aspect.

### B. Third-Party Complaint

Defendants Benchmark, Eagle, and Robert W. Hanson  (collectively for purposes of third-party complaint, "Benchmark") have filed a Third-Party Complaint against the law firm of Bunning, Borst, Enfield & Klein, LLP, Douglas E. Powell, Esq., and Todd Borst, Esq. (collectively, "BBEK"). In this action for indemnity, Benchmark maintains that "BBEK failed

20

to perform its services on behalf of [Benchmark] by failing to undertake a trademark search or timely draft and file the appropriate forms with the State of California," and "failing to timely draft and file Form 1023 Application for Recognition of Exempt Status with the Internal Revenue Service." (Doc. 12, p. 4.)[14]  This was crucial to Benchmark because, as noted above, CROA does not apply to nonprofit, tax-exempt organizations.  15 U.S.C. § 1679a.  Because of this failure, Benchmark claims, "BBEK is or may be liable to [Benchmark] for all or part of the Plaintiffs' claims . . . ."  (Doc. 12, p. 4.)

In its motion for summary judgment, BBEK denies—in a footnote—that it was retained to file a Form 1023.  But the thrust of BBEK's argument is that Benchmark cannot demonstrate an injury, regardless of whether BBEK acted negligently.  Benchmark's Form 1023 was filed on August 25, 2004.  (Doc. 67, Ex. 1.)[15]  The Internal Revenue Code provides that where, as here, a Form 1023 is filed within fifteen months from the date of incorporation, any prospective tax-exempt status will be retroactive to that date.  26 C.F.R. § 1.508-1.  Thus, BBEK points out, Benchmark is in "exactly the same position" as it would be if BBEK had filed the Form 1023 earlier.  (Doc. 67, p. 4-5.)

BBEK's reasoning seems unescapable, but Benchmark nevertheless argues that Federal Rule of Civil Procedure 14(a) allows third-party complaints against a party "who is or *may* be" liable for a plaintiff's claims.  (Doc. 80, p. 4 (quoting Fed. R. Civ. P. 14(a)

---

[14]Benchmark now contends that BBEK "advised . . . that it was appropriate to engage in credit repair while the application was pending." (Doc. 80, p. 3.)  The third-party complaint alleges nothing, however, about the substantive advice that BBEK gave to Benchmark.

[15]The Form 1023 was actually filed for Eagle Literacy Group; Benchmark remains a separate for-profit corporation in the business of marketing Eagle's services.

(emphasis provided by Benchmark)).  Hence, Benchmark contends, "there is a genuine issue as to whether the IRS will follow its own regulation regarding retroactive application." (*Id.* at 6.)  Benchmark appears to argue that BBEK would somehow be liable for the potential lawlessness of the IRS.  If Benchmark's fears prove true, however, it seems that the IRS itself is the more appropriate source for a remedy.

Furthermore, even assuming that Benchmark is correct and that Benchmark *may* assert a third-party claim against BBEK, it fails to demonstrate why this Court *should* permit such a claim.  Because the primary purpose of Rule 14(a) is to promote judicial efficiency, "whether a third-party defendant may be impleaded under Rule 14 continues to be a question addressed to the sound discretion of the trial court."  6 Wright, Miller, & Kane, Federal Practice and Procedure § 1442 (2d ed. 1990).  Here, where the issues and facts presented by the third-party complaint are entirely unrelated to those of the original case, the third-party complaint hinders, rather than promotes, judicial efficiency.

Despite Benchmark's characterization of this case, the only issues remaining are issues of law.  The Internal Revenue Code governs this issue, and disposes of any genuine issues of fact that may once have existed.  If the IRS for some reason chooses not to apply tax-exempt status in this case, Benchmark will not be left without a remedy.  It just won't be tied to this litigation.

## IV. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

(1) The Court GRANTS summary judgment to Plaintiffs as to the corporate defendants, American Financial Access, Inc., American Financial Avenues, Inc., and Benchmark Literacy Group, Inc.

(2) The Court GRANTS summary judgment to the individual defendants, Robert W. Hanson, Jr., and Eric F. Fagan, in their individual capacities.

(3) The Court GRANTS summary judgment to the third-party defendants, Bunning, Borst, Enfield & Klein, LLP, Todd Borst, and Douglas E. Powell.

(4) The Court DENIES all competing summary judgment motions not disposed of above.

s/Nancy G. Edmunds       
Nancy G. Edmunds
United States District Judge

Dated:  October 11, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 11, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer       
Case Manager
